**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**MICHAEL DON WINCE,**

      **Plaintiff,**

**v.**

                                      **Civil Action No.: 5:15CV165**
                                      **(Judge Stamp)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Michael Don Wince ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of the final decision of the defendant, Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on "Plaintiff's Motion for Judgment on the Pleadings" (ECF No. 9) and "Defendant's Motion for Summary Judgment" (ECF No. 11) and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. §§ 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB on August 13, 2012, alleging disability beginning on October 20, 2010. Plaintiff's applications were denied at the initial and reconsideration levels. Plaintiff thereafter requested a hearing, which Administrative Law Judge William R. Paxton ("ALJ") held on March 17, 2014, and at which Plaintiff, represented by Shannan Heinsman, a non-attorney representative, and Cecilia L. Thomas, an impartial Vocational Expert ("VE"),

testified. On May 30, 2014, the ALJ entered a decision finding Plaintiff was not disabled. Plaintiff appealed this decision to the Appeals Council and, on October 26, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

## II. FACTS

### A. Personal History

At the administrative hearing held on March 17, 2014, Plaintiff revealed his personal information. He was born on February 19, 1980. (R. 31). He stated that he was a "widow" [sic] with two children ages twelve and ten. (R. 32). Plaintiff did not graduate from high school but completed the 10th grade. (R. 31).

### B. Medical History Summary

On October 29, 2010, Plaintiff was brought to the Camden-Clark Memorial Hospital by ambulance as a result of a motor vehicle injury. (R. 206). Plaintiff received a diagnosis of a closed head injury, C3 vertebra fracture, and a facial laceration as a result of the motor vehicle injury. (R. 201). Plaintiff reported pain in his neck that was described as 10/10. (R. 204). Plaintiff was transferred to Ruby Memorial Hospital by helicopter. (R. 205).

On October 29, 2010 at 23:30, Plaintiff was admitted to Ruby Memorial Hospital ("Ruby") with an admission diagnoses of a right-sided C3-C4 facet fracture. (R. 206 and 216). Terrence D. Julien, MD attempted to reduce the facet fracture, however he was unsuccessful. (R. 207). The Plaintiff "underwent a staged procedure with initial C3-4 anterior cervical diskectomy and fusion with incomplete reduction of the fracture. He then had a posterior fusion from C2-C5 for fracture stability and reduction." (R. 207).

On October 30, 2010, Fawad J. Khan, MD ("Dr. Khan") reported that the Plaintiff was in stable condition but experiencing neck pain. (R. 216). Dr. Khan also reported that the Plaintiff had an approximate "4cm laceration on his left ear at the junction of the ear to the skull . . . a 4cm laceration in his scalp on the left, superior and posterior to the ear," and a "3 cm laceration under his left eye." (R. 216). The radiology report from the day indicated "CTA Neck Positive for jumping on Right C3 facet with inferior articular process fracture within the C3 vertebral body anterolithesis of C3 on C4. Enlongation and impression of cervical right vertebral artery." (R. 288).

On October 31, 2010, Fawad J. Khan, MD ("Dr. Khan") reported that the Plaintiff was complaining of neck pain. (R. 279). Plaintiff underwent surgery where Terrence D. Julien, MD ("Dr. Julien") attempted to reduce the perched facet. (R. 209). After several unsuccessful attempts to reduce the perched facet, Dr. Julien placed a 7-mm Zero-P implant into the Plaintiff's neck using two 3.5 x 14-mm screws and two 3.5 x 16-mm screws. (R. 209-210).

On November 1, 2010, Plaintiff was evaluated by Alison M. Wilson, MD ("Dr. Wilson") and Dr. Julien. (R. 277). Dr. Wilson stated that the Plaintiff was "doing well overall." (R. 277). Dr. Julien stated that the Plaintiff's pain was "well controlled postoperatively, with no weakness or numbness in arm or legs" and that the Plaintiff had a pain score of "0." (R. 277).

On November 2, 2010, Dr. Julien implanted a "synthes posterior cervical system with seven 3.5 x 14-mm screws, seven locking caps, and two 80-mm rods which were cut and contoured to length." (R. 212). Following the procedure, Cara Sedney, MD ("Dr. Sedney") compared plaintiff's CT cervical spine without intravenous contrast. (R. 294). The comparison was made to a CT cervical spine on October 31, 2010, and an MRI cervical spine on October 30,

2010. (R. 294). Dr. Sedney found that there "has been improvement in the previously visualized C3-C4 anterolisthesis to the unilateral perched C3-C4 facet on the right." (R. 295).

On November 3, 2010, Plaintiff was discharged from Ruby Memorial Hospital with a discharge diagnoses of (1) a C2 bilateral pedicle screws, (2) C3 to C5 lateral mass instrumentation and arthrodesis, and (3) C3-C4 anterior cervical discectomy and fusion (ACDF) with plating. (R. 206).

On November 17, 2010, Plaintiff returned for a post-op follow up visit. (R. 313). At that time he was still wearing his hard cervical collar. Id. The AP and lateral views of the cervical spine were compared to the CT examination on November 2, 2010. The radiology results showed slight anterior listhesis on C3 on C4, which is unchanged compared to the CT examination. (R. 315). There was no change in alignment compared to the CT examination, and no screw loosening. Id.

On January 5, 2011, Plaintiff was seen by Nicci McFadden, PA-C. McFadden reported that the Plaintiff has had "some" head and neck discomfort. (R. 317). An x-ray was taken and revealed an "[u]nchanged appearance of postoperative changes compared to the most recent prior examination." Id.

On May 14, 2011, Plaintiff was seen by Leah Holloran, PA-C. Holloran stated that the patient reported continuous pain in the posterior of his neck with numbness in his right shoulder blade. (R. 322). Holloran also stated that the Plaintiff had "no gait or bb issues," had nine visits to physical therapy which had helped some, and that the pain had not increased since he discontinued using his collar. (R. 322).

On December 7, 2011, Plaintiff was seen by Lindsay Mikeo, PA-C. Mikeo stated that Plaintiff reported that he was working on his farm, experiencing intermittent neck and shoulder

pain, experiencing no gait changes, and smoking one pack per day. (R. 327). An x-ray was taken and found that, "[s]ince the prior study, there has been no change in overall alignment of the cervical spine with focal kyphotic angulation occurring at the C5-C6 level with some anterior listheses on C4. There is likely osseous fusion at the C3-C4 level." (R. 330).

On September 19, 2012, Plaintiff underwent a consultative evaluation with psychologist Melodye Jill Hornish, M.A. (R. 338). Hornish's general observations included that the Plaintiff had a normal posture and gait and arrived on time for his appointment by driving himself. Id. Plaintiff stated that he was applying for benefits because of injuries sustained from the car accident; that he cannot move around a lot; that he was not good on computers or "keen" on reading; and that all of the jobs he had before the accident involved labor. Id. The Plaintiff presented symptoms of not being able to sleep well at night. Id. Most days he is in a "decent mood" but on other days he isolates himself from others. Id. He prefers to be at home. Id. Plaintiff worries about low income and not being able to pay bills. Id.

Regarding medical history, the Plaintiff stated that he was in a car accident in 2010 where his neck was broken; he has a spot on his head that remains sore from the accident; he has no primary care physician and takes no prescription medications; he takes over the counter pain medications; he smokes one to one and a half packs of cigarettes daily and consumes six caffeinated beverages daily. Id. Hornish found that his thought process was logical and coherent; his judgment and recent memory were within normal limits; and his concentration and pace were moderately deficient. (R. 341-342).

Plaintiff reported that he goes to the grocery store once or twice per week; has daily contact with extended family; talks on the phone; occasionally dines in restaurants; gets his children up for school; takes them to the bus; helps them with their homework; completes

household chores; goes to town; watches hunting shows; cooks; engages in woodworking; and manages the household finances. (R. 342). Hornish diagnosed the Plaintiff with anxiety and borderline intellectual functioning. Id.

On September 26, 2012, Plaintiff was seen by Rakesh Wahi, M.D. ("Dr. Wahi") for allegations regarding back, neck, and shoulder problems, and issues concerning a learning disability and anxiety. (R. 345). Dr. Wahi stated that the Plaintiff was alert, fully oriented, and cooperative; his affect was normal; he possessed a medium frame; and he was well built and muscular. (R. 347). On examination of his extremities, Dr. Wahi stated that the Plaintiff had a normal gait; was able to get on and off the examining table; was able to squat; was able to walk on his heels and toes; exhibited no atrophy or hypertrophy; exhibited normal sensation and normal reflexes; exhibited normal range of motion of the shoulders, elbows, wrists, hips, knees and ankles bilaterally. Id. Dr. Wahi stated that while the Plaintiff has a normal range of motion in his shoulders, pain occurs in the neck while trying to move his shoulders. Id. Dr. Wahi diagnosed the Plaintiff with osteoarthritis involving the hands and traumatic arthritis involving the cervical spine. Id. Dr. Wahi found that the Plaintiff was able to carry out day-to-day activities, but was unable to lift anything heavy and has loss of a considerable range of motion at his cervical spine. Id. Dr. Wahi also found that, regarding the learning disability, Plaintiff was able to function well until recently. Id.

On March 5, 2013, Plaintiff was seen by Steven Howe for gastroesophageal reflux disease, anxiety, and neck pain. (R. 369). Plaintiff stated that his gastroesophageal reflux disease and anxiety was doing better with the medications. Id. Plaintiff also stated that his neck pain was "better." Id. However, Plaintiff listed his neck pain at 10/10. Id. A review of his musculoskeletal system resulted in complaints of limited range of motion and stiffness. (R. 370). A review of his

psychiatric system resulted in complaints of anxiety. Id. During the exam, Howe noted that the Plaintiff appeared comfortable, had a normal nutritional status, and was alert and oriented x3. Id. His gait and all deep tendon reflexes were normal. Id. Howe's assessment indicated coding for anxiety and gastroesophageal reflux disease. (R. 371).

On April 30, 2013, Plaintiff was seen by Steven Howe for depression (R. 360). Plaintiff stated that his medications for gastroesophageal reflux disease and anxiety were not working as well as they were before. Id. The Plaintiff complained of anxiety, decreased concentration, panic attacks, and sleep disturbances. (R. 361). Howe noted that the Plaintiff appeared comfortable, had a normal nutritional status, and was alert and oriented x3. (R. 362). In examining the Plaintiff's neck, Howe noted that it was normal in appearance and nontender. Id. The Plaintiff exhibited normal gait, deep tendon reflexes, sensation, and cerebellar functions. (R. 363 – 364). A review of his psychiatric system resulted in complaints of depression. (R. 364). Howe's assessment indicated coding for anxiety and gastroesophageal reflux disease. Id.

On August 20, 2013, Plaintiff was seen by Kari Ramsey for a follow up visit (R. 356). Plaintiff indicated a pain score of 7/10. Id. The Plaintiff complained of reflux/heartburn, back pain, joint pain, muscle aches, stiffness, anxiety, irritability, panic attacks, mood swings, and feelings of stress. (R. 358). Ramsey noted that the Plaintiff appeared comfortable, had a normal nutritional status, and was alert and oriented x3. (R. 358). In examining the Plaintiff's musculoskeletal system, Ramsey found tenderness in the spine, ribs, and pelvis, decreased range of motion, and decreased muscle tone. (R. 359). Ramsey's assessment indicated coding for anxiety, gastroesophageal reflux disease, and arthritis. Id.

On November 19, 2013, Plaintiff was seen by Alicia Rush complaining of back pain and neck pain as a result of an injury. (R. 352). Plaintiff also complained of having stiff hands in the

mornings. Id. Rush noted that the Plaintiff appeared comfortable, had a normal nutritional status, and was alert and oriented x3. (R. 354). In examining the Plaintiff's musculoskeletal system, Rush found tenderness in the spine, ribs, and pelvis, decreased range of motion, and decreased muscle tone. Id. Rush found that the Plaintiff's mental status, affect, and judgment to all be normal. Id. Rush's assessment indicated coding for anxiety, gastroesophageal reflux disease, and arthritis. (R. 354 – 355).

On February 18, 2014, Plaintiff was seen by Alicia Rush for back pain and neck pain as a result of an injury and hot flashes. (R. 378). Rush noted that the Plaintiff appeared comfortable, had a normal nutritional status, and was alert and oriented x3. (R. 384). In examining the Plaintiff's musculoskeletal system, Rush found tenderness in the spine, ribs, and pelvis, decreased range of motion, and decreased muscle tone. (R. 380). Rush found that the Plaintiff's mental status, affect, and judgment to all be normal. Id. Rush's assessment indicated coding for anxiety, essential hypertension, gastroesophageal reflux disease, and arthritis. (R. 385).

On February 28, 2014, Plaintiff was seen by Nicole Miller to get x-rays for his right and left hands, bilateral wrists, neck, and back (thoracic and lumbar). (R. 388). He stated to Nicole Miller that Jan Dils was his lawyer and that he was trying to obtain disability. Id. The Plaintiff further informed Miller that he had been in a car accident on October 19, 2010, and since the accident, pain in all areas to be x-rayed was getting worse, but that the medication he was taking for anxiety was helping. Id. Miller noted that the Plaintiff appeared comfortable, had a normal nutritional status, and was alert and oriented x3. (R. 389). In examining the Plaintiff's musculoskeletal system, Miller stated that the patient complains of mid back and lower back pain. (R. 390). In examining the Plaintiff's extremities, Miller stated that the patient could move all extremities, but complained of bilateral arm pain. Id. Rush found that the Plaintiff's mental

status, affect, and judgment were normal. Id. Rush's assessment indicated coding for wrist joint pain, hand pain, pain in cervical spine, pain in thoracic spine, low back pain, anxiety, and essential hypertension. (R. 390).

On March 18, 2014, Plaintiff was seen by Tina Mitchell for a follow up to get testing done for arthritis in his hands. (R. 392 - 393). The Plaintiff also complained of joint pain, joint swelling, muscle aches, and neck pain. (R. 395). Plaintiff fell on the day prior, jammed his arm, and complained of pain in his neck. Id. Mitchell noted that Plaintiff appeared comfortable, had a normal nutritional status, and was alert and oriented x3. (R. 395). In examining Plaintiff's musculoskeletal system, Rush found tenderness in the spine, ribs, and pelvis, decreased range of motion, and decreased muscle strength/tone. (R. 395). Cranial nerves II-XII were intact. (R. 396). An osteopathic manipulative treatment exam was conducted and reveled tenderness in the Plaintiff's head, neck, thoracic T1-4, thoracic T5-9, thoracic T10-12, lumbar, pelvis/sacrum, pelvis/innominate, lower extremity (L), lower extremity (R), upper extremity (L), upper extremity (R), ribs, abdomen, and other. (R. 396). Mitchell's assessment indicated coding for articular cartilage disorder of hand, essential hypertension, and somatic dysfunction. (R. 396). A total of 12 images of the bilateral hands and wrists were submitted. (R. 400, 401, 406, 407). The findings of these images included: no acute fracture or dislocation; normal bone mineralization; normal carpal rows, distal radius, ulna, and ulnar styloid; aligned metacarpals and phalanges; no periarticular erosions or joint space narrowing; and no soft tissue abnormality. Id. The impression was that there was normal alignment and no acute osseous injury. Id.

A total of 13 images of the spine were submitted. (R. 398, 402, 404). The findings of these images included: cervical lordosis straightening; no jumped, perched, or locked facets; no prevertebral soft tissue swelling; an intact tracheal air column; no cervicothoracic,

thoracolumbar, or lumbosacral junction; all craniocervical junctions were intact; thoracic spine alignment and lumbar spine alignment were normal; mild discogenic disease with anterior ossific spurring at T11-T12 was seen; normal body heights, intervertebral disc space heights, and bone mineralization were normal; no anterior or retrolisthesis and no facet arthropathy was seen. Id. The impression consisted of a stable cervical spine post anterior cervical fusion at C3-C4 and posterior cervical fusion between C2 and C5; stable straightening of the cervical lordosis; and normal radiographs of the thoracic and lumbar spine. Id.

### C. Testimonial Evidence

At the administrative hearing held on March 17, 2014, Plaintiff revealed his personal information. He was born on February 19, 1980. (R. 31). He stated that he was a widow [sic] with two children ages twelve (12) and ten (10). (R. 32). He reached the tenth grade in his high school education. (R. 31). At the time of the hearing, he testified that he was not working. (R. 33).

Plaintiff next testified regarding his work history. He stated that his last job he had was with Asplundh Tree Company Id. Plaintiff testified that he last worked on October 29, 2010. Id. When describing this job, Plaintiff testified that he would wear spurs and saddles and carry the saw up the tree to trim the tree around power lines. Id. He worked that job for approximately twelve (12) years. Id.

Plaintiff then was asked by his attorney to describe the difficulty he has had since the motor vehicle accident as to his ability to move around, use his arms and legs, and what type of treatment he was receiving. (R. 34). Plaintiff stated that he had a limited ability to turn his neck and lift heavy objects. Id. Plaintiff stated that he was able to maybe lift 10 pounds for two to three hours a day. Id. Plaintiff stated that most of the time there was pain in his neck, and

described it as a stinging, burning, or aching from his neck to his shoulders. Id. The Plaintiff also complained of issues with his hands being stiff, pain in his lower back, and pain in his left leg and left foot. (R. 38 – 39). Plaintiff stated he had these issues prior to the motor vehicle accident, but they have gotten worse since the accident and he could no longer deal with them as he had prior to the accident. (R. 40).

Regarding treatment options for his pain, Plaintiff stated that he completed physical therapy and that it helped "some" (R. 34 - 35). The Plaintiff explained that this personal injury attorney from the car accident was able to help him obtain a medical card that he could use until his personal injury case was closed. (R. 35). Upon the settlement of the Plaintiff's personal injury case, the Plaintiff had to reimburse the medical card for expenses. Id. The Plaintiff lost his insurance coverage around November of 2011. Id. The Plaintiff explained that after he stopped going to physical therapy, his neck would tighten back up again. Id.

The testimony next turned to the discussion of Plaintiff's typical day. Plaintiff described his typical day as being mostly around the house. (R. 38). He stated that his ability to turn his head had become compromised. (R. 36). He stated he was able to do some household chores, however he had to do such chores in moderation. Id. After approximately ten to fifteen minutes, his neck, back, and shoulders begin stinging and burning. Id. His neck pain is currently being treated with pain killers, pills for arthritis, and pills for muscle spasms. (R. 37 - 38). Plaintiff said that he can mow the grass with a riding lawn mower for approximately a half hour at a time before he needs a break. (R. 38). At most, he needs an hour break after riding the riding lawn mower. Id. Plaintiff also needs breaks when filling out paperwork. (R. 41 – 42). After filling out paperwork for 10 minutes, Plaintiff stated that he needs thirty to forty-five minutes for the stinging and burning in his shoulder blades to subside. Id.

Next, the ALJ questioned Plaintiff about his hands. (R. 43). Plaintiff stated that he has problems with both of his hands, but his right hand is worse than his left. Id. Plaintiff stated that he was still able to button clothing, tie his shoes, and write for 10 or 15 minutes at a time. Id. Plaintiff explained that this problem was "pretty much" caused by his shoulders. Id. The ALJ then questioned the Plaintiff about his regular activities outside of the home. Id. Plaintiff stated that his activities outside of the home consist of using the riding lawn mower. (R. 44).

### D. Vocational Evidence

Ms. Celia Thomas, an impartial vocational expert, also testified at Plaintiff's administrative hearing. Id. The VE classified Plaintiff's work as a tree trimmer with Asplundh as "heavy, semi-skilled, SVP: 4." (R. 45). The VE went on to state that the exertional level is heavy but may be considered very heavy at times. Id.

The ALJ then asked the VE the following hypothetical:

Hypothetically if I were to assume a person who is a younger person, as defined in the regulations, currently age 34, who has a 10th grade or limited education as defined in the regulations, who has past work as you described, I assume that such person would be limited to performing sedentary work as defined in the regulations, but who can never perform climbing of ladders, ropes or scaffolds or crawling. Who can occasionally perform balancing, kneeling, stooping, crouching and climbing of ramps and stairs. Who is limited to occasional overhead reaching, to frequent handling, fingering, and feeling. Who must avoid concentrated exposure to extreme cold, vibration or hazards such as heights and machinery. Who is limited to understanding, remembering, and carrying out simple instructions, work without specific production quotas or rapid pace. Based on those limitations, would there be any unskilled sedentary jobs that such a person could perform?

(R. 46). The VE stated that an individual could perform work as a surveillance system monitor. Id. The VE stated an estimated 9,500 positions existed nationally, with an estimate of 900 positions existing regionally. Id. The VE further indicated that a person limited to simple instructions may have difficulty in surveillance system monitor positions that required "more

cameras to monitor and more record keeping duties," and that she was unable to separate those positions out. (R. 46-47)

The ALJ then added a limitation to the hypothetical: the individual must be limited to occasional handling, fingering and feeling rather than frequent handling, fingering and feeling. (R. 47). The VE testified that the job would still be available "at an occasional range in the current market." Id.

The ALJ then added another limitation to the hypothetical: if the individual must be afforded the option of sitting for an hour at a time, and standing for fifteen minutes at a time, could such a person perform the job named, being a surveillance system monitor. (R. 47 – 48). The VE stated that as long as the person can attend to the task, that there shouldn't be any interference. (R. 48). When asked if the job would still be available to such persons that needed to be off task for as much as an hour a day, the VE stated that the person would be able to go out and get the job, but that he or she would likely lose the job in very short order. (R. 48).

The ALJ then removed the off-task limitation and asked the VE if the person would be able to perform the job if he or she would have to lie down during a portion of the day outside of normal breaks for as much as a half hour a day. Id. The VE responded by stating that she did not know of any employer that would tolerate the need to lie down in such a fashion. Id. The ALJ then substituted reclining in a recliner instead of lying down to the VE; however the VE's answer was unchanged. Id.

### E. Disability Reports

*Disability Report*

Plaintiff filled out a disability report on August 27, 2012. According to the interviewer, Plaintiff was coherent and had no problem hearing, breathing, understanding, concentrating,

talking, and answering. (R. 149). The interviewer remarked that there was "nothing remarkable about the phone interview. Id. He indicated that his back, neck, and shoulder problems, learning disability, and anxiety limited his ability to work. (R. 152). He further stated that he worked as a tree trimmer for twelve years, which required him to walk, stand, sit, climb, sit, handle large objects; write, type, or handle small objects, and reach for ten hours each day (R. 153–154).

Plaintiff's November 13, 2012, disability report indicated that the Social Security Field Office was unable to contact Plaintiff, and no new information was reported. (R. 176-177)

On October 30, 2012, and January 7, 2013, Plaintiff completed two disability appeal reports. No new changes were noted on his first appeal. However in his second appeal, Plaintiff indicated he started experiencing more pain in his shoulders and neck and that his hand grip was not very good. (R. 178). He further stated that driving for long periods of time causes "a lot of stinging and stiffness in [his] neck and shoulders," and a numbing sensation in his left foot if he failed to stretch. Id. Plaintiff further indicated that since the pain has worsened he stays around the house more and doesn't drive as much. (R. 180).

### F. Lifestyle Evidence

#### 1. Adult Function Report

On September 4, 2012, Plaintiff completed an adult function report. He stated that he is unable to lift much weight, that it takes time for his neck to loosen up and that if he "does too much" then he experiences a stinging in his shoulders and pain in his neck. (R. 163). When describing his typical day, Plaintiff stated that he transports his children to and from school, cares for his pets, does a little housecleaning, and watches television. (R. 164). Due to his pain, Plaintiff noted that he is unable to work all day, but noted that he does laundry, a little yard work and grocery shopping. (R. 165-66). Plaintiff can still take care of his own personal care. (R.

164).  He stated that he tries to go outside every day either by walking or driving a car.  (R. 166).

Regarding his hobbies and social activities, Plaintiff indicated that he enjoys fishing and wood

work, i.e., building bird houses and shelving, explaining that he does wood work once or twice a

week and goes fishing once a month as long as he is not in pain.  (R. 167). Plaintiff further stated

that he is unable to stand or sit for long periods of time and that his body becomes stiff if he sits

to fish or if he works on the wood for too long.  Id.  Regarding his physical abilities, Plaintiff

stated that he could lift approximately twenty pounds, but explained that squatting, bending, and

standing causes pain in his back and neck, and that reaching and walking causes his shoulders to

hurt, sting and burn. (R. 168).  Plaintiff further stated that he can walk a few hundred feet before

taking a twenty minute break.  Id.  Lastly, Plaintiff noted that he has difficulty reading and

comprehending what he reads.  (R. 168).  He further noted that stress causes him to have anxiety

attacks.  (R. 169).

### III. THE FIVE STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work. . . . '[W]ork which exists in the
> national economy' means work which exists in significant numbers either in the
> region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-

step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once this is proven, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## IV. THE ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since October 29, 2010, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: status-post cervical discectomy and fusion for treatment of cervical fracture, grade 1 anterolisthesis of C3 and C4, cervicalgia, osteoarthritis of the hands, and mental impairments of borderline intellectual functioning and an anxiety disorder. (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he can never climb ladders, rope or scaffolds; only occasionally balance, kneel, stoop, crouch, crawl or climb ramps or stairs; he is limited to occasional overhead reaching, handling, fingering and feeling; he must avoid concentrated exposure to extreme cold, vibration and hazards such as heights and machinery; he is limited to understanding, remembering and carrying out simple instructions, to work without specific production quotas or rapid pace; he needs the option to sit and stand as needed; can sit for an hour at a time and stand for fifteen minutes at a time.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant has a limited education and is able to communicate in English (20CFR 404.1564).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, from October 29, 2010, through the date of this decision (20 CFR 404.1520(g)).

# V. DISCUSSION

## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The ALJ erred by failing to perform the required function-by-function analysis when determining Wince's RFC. (Pl.'s Br. at 8-12).

2. The ALJ's step five finding is not supported by the VE's testimony since the job cited by the ALJ does not exist in significant numbers. (Pl.'s Br. at 12-15).

The Commissioner contends:

1. Substantial evidence supports the ALJ's RFC assessment, where he accounted for all credibly-established limitations related to Plaintiff's neck impairment. (Def.'s Br. at 9–13).

2. The ALJ Appropriately relied on the testimony of the VE at step five. (Def.'s Br. at 13–15).

## C. Substantial Evidence Does Not Support the ALJ's RFC finding

Plaintiff first contends that the ALJ failed to perform a complete function-by-function analysis when determining his RFC. (Pl's Br. at 10). Specifically, Plaintiff asserts that the ALJ "did not discuss any evidence as it related to limitations that flowed from each of the impairments he found to be severe, in particular he never accounted for Wince's severe impairment cervicalgia in the RFC he found." Id. Plaintiff argues that the ALJ's decision "does not contain any indication that the ALJ considered the limitations arising from [Plaintiff's] pain, and further contends the omission was "significant and harmful." Id. at 11.

Conversely, Defendant argues the ALJ's RFC is supported by substantial evidence, arguing the ALJ's RFC assessment "included a detailed review of the medical evidence and opinions supporting the functional findings, [and] no further 'function-by-function' analysis was necessary." (Def's Br. at 9).

A claimant's RFC is the most a claimant can still do in a work setting do despite [his or her limitations. 20 C.F.R. §416.945(a). When assessing a claimant's RFC, the ALJ "will consider [the claimants] ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 416.945(a)(4).

Social Security Ruling 96–8p provides the process for assessing a claimant's RFC. Under that ruling the RFC "'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations. See Mascio v. Colvin, 780 F.3d 632, 636 (4th

Cir. 2015) (quoting SSR 96-8p, 61 Fed.Reg. at 34,4474-01). Only after a function-by-function analysis may the RFC be expressed "in terms of the exertional levels of work." Id. The ruling further requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Mascio 780 F.3d at 636. (quoting SSR 96-8p, 61 Fed. Reg. at 34,474-01).

Failing to consider all of an individual's functional capacities to support an RFC assessment based on an exertional category creates the danger that the adjudicator will "either overlook the limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." Id. (quoting SSR 96-8p, 61 Fed. Reg. at 34,4474-01). Furthermore, remand may be appropriate "'where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Id. (quoting Cichocki v. Astrue, 72 F.3d 172, 177 (2d. Cir. 2013). Such is the case, here.

Here the ALJ concluded Plaintiff's severe impairments included "status –post cervical discectomy and fusion for treatment of cervical fracture grade 1 anterloisthesis of C3 on C4, cervicalgia, osteoarthritis of the hands, and mental impairments of borderline intellectual functioning and an anxiety disorder," (R. 15) Specifically regarding Plaintiff's cervicalagia, the ALJ noted Dr. Whai reported Plaintiff is able to carry out all of his day-to-day daily activities, but "has severe traumatic arthritis involving his cervical spine, which prevents him from turning his head side to side." (R.18). The ALJ cites no other evidence regarding Plaintiff's range- of-motion-limitation.

The undersigned finds the ALJ's RFC assessment is not supported by substantial evidence. While the ALJ concluded what functions Plaintiff can perform. He failed to discuss his ability to perform these particular functions for a full workday. See Mascio, 780 F.3d at 637 (finding the ALJ erred by failing to address the claimant's ability to perform certain functions for a full workday.) Moreover, while the ALJ acknowledged Dr. Whai's reports of Plaintiff's limitation in turning his head from side-to-side, and gave the opinion little weight, the ALJ failed to reference Plaintiff's range of motion limitations in the RFC, and did not provide any explanation for failing to do so. As a result the undersigned is "left to guess about how the ALJ arrived at his conclusions on Plaintiff's ability to perform relevant functions." Mascio, 780 F.3d at 637. Consequently, the undersigned finds the ALJ erred in failing to include Plaintiff's range-of-motion limitations relating to his neck impairments from the RFC findings and that this error was not harmless. Accordingly, the undersigned finds that remand is appropriate.

### D. Vocational Expert's testimony

Plaintiff next argues that the "ALJ's step five finding is not supported by the VE's testimony since the job cited by the ALJ does not exist in significant numbers." (Pl's Br. at 12). Plaintiff asserts that the VE's testimony was unreliable for a three reasons: (1) the VE "did not identify the geographical region that applied in this case, (2) "the VE citied one job only—surveillance system monitor—and gave a total number of that job that existed in the national economy, but then testified that some of the that total number of jobs could not be performed with the restrictions included in [the ALJ's] hypothetical question and (3) the "VE did not supply the total number or percentage of jobs that would actually be performable out of the total jobs that existed." (Pl's Br. at 13).

Conversely, Defendant argues substantial evidence supports the ALJ's decision explaining the "Commissioner satisfies her burden where she establishes that there is one job existing in significant numbers in the national economy that a claimant can perform regardless of whether that job is available locally," and further arguing "the VE did not testify that the limitations in the hypothetical would significantly erode the occupational base beyond the numbers provided in her testimony." (Def. Br. 13).

Pursuant to the regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which [the claimant is] able to meet with [his or her] physical or mental abilities and vocational qualifications." 20 C.F.R. 404.1566. See also, Farnsworth v. Astrue, 604 F. Supp. 2d 828, 859 (N.D.W.Va. 2009) (explaining that where there is a significant number of jobs in one or more occupations, work exists in the national economy.) The Fourth Circuit has not specifically established the minimum number of jobs necessary to satisfy a "significant number," but has held that as few as 110 regional jobs is not insignificant. Hicks v. Califano, 600 F.2d 1048, 1051 (4th Cir. 1979). See also, Allen v. Bowen, 816 F.2d 600, 602 (11th Cir. 1987) (finding 174 jobs to be significant.) The regulations further provide that "it does not matter whether work exists in the immediate area in which the [claimant] live[s]," rather "work exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country." 20 C.F.R. 404.1566.

Here, the undersigned finds the VE's reference to the region as West Virginia, Ohio and Kentucky, is of no consequence, as the regulations do not require the VE to specify that work exists in significant numbers in the area where Plaintiff lives. However, the undersigned finds the VE's testimony unreliable for two reasons: (1) the VE's answer to one of the ALJ's

hypothetical questions lacks clarity, and (2) it is unclear whether the posed hypothetical included all of Plaintiff's functional limitations.

During the hearing, the ALJ posed the following question:

Q: Hypothetically if I were to assume a person who is a younger person, as defined in the regulations, currently age 34, who has a 10th grade or limited education as defined in the regulations, who has past work as you described, I assume that such person would be limited to performing sedentary work as defined in the regulations, but who can never perform climbing of ladders, ropes or scaffolds or crawling. Who can occasionally perform balancing, kneeling, stooping, crouching and climbing of ramps and stairs. Who is limited to occasional overhead reaching, to frequent handling, fingering, and feeling. Who must avoid concentrated exposure to extreme cold, vibration or hazards such as heights and machinery. Who is limited to understanding, remembering, and carrying out simple instructions, work without specific production quotas or rapid pace. Based on those limitations, would there be any unskilled sedentary jobs that such a person could perform?

In response, the VE stated:

Considering those factors the only thing that I could offer meeting the parameters of the hypothetical would be something like a surveillance system monitor position. Those number an estimated 9,500 nationally, an estimated 900 regionally. A representative DOT 379.367-010. A person with limitations to simple instructions there may be some settings in which that job would occur that the person I would expect might have some difficulty if there were a lot of cameras. . . . If there were more cameras to monitor or more record keeping duties, but I'm unable to separate those out. That would be all, the only jobs that I would offer given the hypothetical, Your Honor.

(R. 46-47).

The VE's statements were unclear at best, and at times rambled and contradicted themselves. These very contradictions by the VE suggest that if the surveillance system monitor position involves certain levels of complexity, then Plaintiff might not be able to perform those more complex jobs. This casts doubt on her initial assessment, obscuring the actual number of system monitor positions available.

R. 46-47. Stated differently, the VE's response reveals that the offered figures—9,500 nationally and 900 regionally—fail to account for all of the factors which might further reduce her job estimate numbers, in a potentially significant way. Because the number of available jobs she offered failed to factor in the level of complexity which specifically fit Plaintiff's capability limits, the final numbers given to the ALJ cannot be determined. The VE's attempt to qualify her answer regarding the ALJ's hypothetical question actually served to make her answer less clear, and makes it impossible to extract any clear estimates of available jobs.

Turning to the ALJ's posed hypothetical questions, because the ALJ never determined Plaintiff's range-of-motion limitations relating to Plaintiff's neck impairments, the undersigned is unable to determine whether the hypothetical questions posed to the VE included all of Plaintiff's functional limitations. See Hines v. Barnhart, 453 F.3d 559, 566 (4th Cir. 2006) (finding "[i]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration off all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments.")(citations omitted).

On remand, the ALJ must determine Plaintiff's range of motion limitations relating to his neck impairments and pose hypothetical questions which account for all of Plaintiff's functional limitations. The VE will need to assess the actual number of jobs with a complexity level that fits Plaintiff's capabilities.

## VI. RECOMMENDED DECISION

For the reasons stated herein, I accordingly recommend Defendant's Motion for Summary Judgment (ECF No. 11) be **DENIED,** and the Plaintiff's Motion for Judgment on the Pleadings (ECF No. 9) be **GRANTED** and this matter be **REMANDED** for the reasons set forth within.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John P. Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 12th day of January, 2017.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE